**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GOSHEN ROAD ENVIRONMENTAL
ACTION TEAM, a community
organization; IRIS BROWN; HATTIE
BROWN,
<u>Plaintiffs-Appellants,</u>

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE; RURAL HOUSING AND
COMMUNITY DEVELOPMENT SERVICE;

No. 98-2102

NORTH CAROLINA STATE DIRECTOR,
Rural Housing and Community
Development Service; TOWN OF
POLLOCKSVILLE; UNITED STATES
DEPARTMENT OF AGRICULTURE,
Secretary; RURAL HOUSING AND
COMMUNITY DEVELOPMENT SERVICE,
Administrator,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
Malcolm J. Howard, District Judge.
(CA-95-36-4-H-1)

Argued: March 5, 1999

Decided: April 6, 1999

Before WILKINSON, Chief Judge, and WILKINS and
LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Stephon John Bowens, LAND LOSS PREVENTION
PROJECT, Durham, North Carolina, for Appellants. Claire Lynn
Brock, Trenton, North Carolina; Stephen Aubrey West, Raleigh,
North Carolina, for Appellees. **ON BRIEF:** Janice McKenzie Cole,
United States Attorney, Anne M. Hayes, Assistant United States
Attorney, Barbara D. Kocher, Assistant United States Attorney,
Raleigh, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A local neighborhood group and two residents of the neighborhood
sued the United States Department of Agriculture (USDA), its agen-
cies and officials, as well as the Town of Pollocksville, North Caro-
lina in connection with the Town's siting of a wastewater treatment
facility. The group alleged violations of Title VI of the Civil Rights
Act of 1964, 42 U.S.C. § 2000d et seq., and the National Environmen-
tal Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq. The district
court granted summary judgment to the USDA and the Town on all
claims. We affirm.

I.

The Town of Pollocksville is located in Jones County, North Caro-
lina. In 1985 the Town became concerned because raw sewage was
being pumped directly into nearby Trent River and Mill Creek, and
the septic tanks of its residents were beginning to fail. The Town con-

2

tracted with the engineering firm of Rivers and Associates, Incorporated to examine options for the construction of a wastewater treatment facility. Rivers recommended a treatment facility that would discharge treated effluent into the Trent River.

The Town then applied for and received funding for the facility from the USDA through the Farmers Home Administration (FmHA). Pursuant to NEPA, in April 1986 the FmHA conducted an Environmental Assessment (EA) of the proposed project. 40 C.F.R. § 1501.4(b). The FmHA concluded that the project would not have a significant effect on the environment, and therefore a more in-depth Environmental Impact Statement (EIS) was unnecessary. 40 C.F.R. § 1501.4(c). Consequently, it issued a Finding of No Significant Impact (FONSI). Id. § 1501.4(e).

Prior to the construction of the facility, however, the State of North Carolina reclassified the Trent River as a nutrient sensitive waterway. As a result, Rivers decided that additional treatment of the waste would be required before discharge into the Trent. To avoid the need for this additional treatment, Rivers recommended that the Town consider land treatment -- a process in which treated effluent is sprayed onto fields surrounding the facility. In connection with the land treatment, Rivers requested that the Town identify four or five plots of good agricultural land for a facility.

The Town agreed that a land treatment system was the better of the two options. If a land treatment system were to malfunction, it would not release raw sewage directly into the nutrient-sensitive Trent as a river discharge system would. Moreover, the State of North Carolina was considering more stringent standards for river discharge systems in the future.

The Town began searching for possible land application sites. It rejected siting the facility to the north because that would have required pumping the waste over the Trent River. Similarly, the Town decided against looking east since that would have required sending the waste over Mill Creek, which ultimately empties into the Trent. Finally, the Town eliminated land to the south because of its notoriously poor soil.

3

The Town selected four possible sites to the west for further study. Two of the sites -- sites one and three -- were owned by white persons while the other two -- sites two and four-- were owned by African-Americans. Rivers contracted with Law Engineering to perform a soils analysis of the four sites. Law Engineering concluded that two of the sites -- sites two and four -- were preferable because they had good soil, presented the least potential for public contact, and provided natural buffers to adjoining land. In its report to the Town, Rivers recommended site four because its soil was more absorbent. Site four required slightly less land than site two, it had existing road frontage for easier access, and it was farther from the Trent in the event of a mishap.

The Town selected site four and submitted the new design and location to the FmHA. In February 1991 the FmHA issued an amendment to its original EA. It determined that "the changes to the proposed project [did] not alter the conclusion" reached in its original EA, again deciding that a more detailed EIS was not required. The Town condemned site four, constructed the facility, and began operating it.

The selection of site four was not popular with the residents of the area. The site was part of a 500-acre tract known as the Goshen tract. The tract was settled during the 1870s by freed slaves and has been owned largely by African-Americans ever since. The Goshen tract also contained a cemetery dating back to the founding of the Goshen community which served as the final resting place for many of the area's past residents.

A neighborhood group, the Goshen Road Environmental Action Team (GREAT), and two residents of the neighborhood, Hattie Brown and Iris Brown, brought suit in the United States District Court for the Eastern District of North Carolina. GREAT alleged that the USDA, its agencies and officials, and the Town of Pollocksville violated Title VI and NEPA. GREAT sought a preliminary and permanent injunction of the operation of the facility. The district court denied the request for a preliminary injunction and this court affirmed. Goshen Road Environmental Action Team v. USDA, 103 F.3d 117 (4th Cir. 1996) (unpublished table decision). On remand, the

4

district court granted summary judgment to the defendants. GREAT now appeals.

II.

After careful review and consideration, we affirm the judgment of the district court substantially for the reasons stated in its thorough opinion.

A.

Title VI prohibits discrimination on the basis of race in any program receiving federal funding. 42 U.S.C. § 2000d. The USDA has implemented regulations under Title VI that prohibit recipients of federal funds from locating facilities in such a way as to create a disparate racial impact. 7 C.F.R. § 1901.202(2)(viii)(A).

GREAT claims that the Town and the USDA did just that by siting the wastewater treatment facility in a majority African-American community. The district court found that the Town and the USDA demonstrated substantial legitimate reasons for the site selection, and that GREAT failed to demonstrate either the existence of viable alternative sites or that the Town's stated reasons for locating the facility were a pretext for discrimination.[1] See Georgia State Conf. of Branches of NAACP v. Georgia, 775 F.2d 1403, 1417 (11th Cir. 1985) (no violation of Title VI where nondiscriminatory reason existed for decision and where no viable alternatives could be found).

We agree with the district court. The Town provided substantial legitimate nondiscriminatory reasons for its site decision. First, it chose a land application system because river discharge would require additional treatment, because the results of a malfunction in a land application system were more benign than those of a river discharge system, and because the regulatory future of a river discharge system was uncertain.

_____

[1] The USDA claims that the federal funding entity cannot be sued under Title VI. Because we hold that the district court was correct in finding that the defendants did not violate Title VI, we need not reach this issue.

Second, the Town had legitimate reasons for its choice of facility location. The Town rejected sites to the north and east because those sites would have required crossing the Trent River and Mill Creek respectively. Under either option, were the pipe to deteriorate, the Town risked releasing raw sewage into the Trent. And it rejected possible sites to the south due to the poor quality of their soil.

As to the western sites, the Town selected site four based on the legitimate, race-neutral recommendation of its engineers. The engineers narrowed their own list to sites two and four because those sites provided the least potential for public contact and required smaller buffers. As between the two sites, the engineers recommended site four because it required slightly less land due to better soil, its road frontage provided for easier access, and it was farther from the Trent.

GREAT adduces no scientific evidence of its own supporting its claim that other equally effective sites existed. Indeed, GREAT simply offers a river discharge system or the three other land application sites the Town considered as proof of alternatives. As noted, however, the Town rejected those very possibilities for legitimate nondiscriminatory reasons.

Finally, GREAT's claim of pretext is unpersuasive. GREAT maintains that the Town's reason for rejecting sites to the north and east -- that untreated waste would have to cross either the Trent River or Mill Creek -- is pretextual because the choice of site four required pumping waste across a swamp as well as Goshen Creek. GREAT produces no evidence, however, that crossing the swamp or Goshen Creek presented the same risk of polluting the recently reclassified Trent River. In sum, the Town's siting decision did not violate Title VI.

B.

NEPA requires that federal agencies prepare an EIS for every major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine whether an EIS is necessary, the agency must prepare an EA. 40 C.F.R. § 1501.4(b)-(c). "If the agency decides that no [EIS] is required because the proposed action will not have a significant impact, it reports its decision

6

in a [FONSI]." North Carolina v. FAA , 957 F.2d 1125, 1128 (4th Cir. 1992); 40 C.F.R. § 1501.4(e). In reviewing the agency's decision to issue a FONSI rather than perform an EIS, a court must determine whether the agency took a "hard look" at the project's effects and whether the decision was arbitrary or capricious. See Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 443 (4th Cir. 1996).

GREAT argues that the FmHA's amended EA failed to take the requisite hard look and therefore the FmHA's decision not to perform an EIS was arbitrary and capricious. First, GREAT maintains that the amended EA was insufficiently site-specific because it failed to reference directly the Goshen area when discussing the environmental effects of the land application facility. GREAT also argues that the amended EA failed to consider the Goshen area's historical significance. We agree with the district court, however, that because the 1986 EA sufficiently covered the Goshen tract, greater specificity in the amended EA was unnecessary.

In defining the project area, the 1986 EA referenced not only the Town but its environs. Similarly, the section of the 1986 EA dealing with the effects on air quality discussed the "Pollocksville area" and the section of the EA estimating the effect on endangered species covered all of Jones County. Moreover, the 1986 EA specifically referred to the State Historic Preservation Officer's finding that "no properties of architectural, historic or archeological significance" would be affected by the river discharge site -- a site less than half a mile away from the Goshen tract.

Second, GREAT argues that the amended EA failed adequately to consider alternatives. The 1986 EA, however, rejected as infeasible several alternative methods of treatment and there was no need to repeat those findings in the amended EA. More importantly, the amended EA detailed the choice of the land application system over the river discharge system. Moreover, the amended EA specifically referenced the process the Town followed in choosing site four for the land application facility.

Finally, GREAT contends that the amended EA failed to consider the racially disproportionate burden resulting from the Town's choice

7

of site four. GREAT, however, points us to no provision of NEPA or its implementing regulations that requires an EA to include a disparate impact analysis. And even if such an analysis were necessary, "economic or social effects are not intended by themselves to require preparation of an [EIS]." 40 C.F.R. § 1508.14.**2**

Consequently, the siting process did not contravene NEPA.

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

_____

**2** GREAT also contends that the USDA and the Town failed to provide sufficient notice of the proposed land application project. In matters of local concern such as this one, notice may be given by publication in a local newspaper. 40 C.F.R. § 1506.6(b)(3)(iv). The USDA and the Town published notice in the Sun-Journal -- a newspaper of sufficiently local circulation to provide the necessary notice.