UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NANCY WILDS, individually and on
behalf of all others similarly
situated,

    *Plaintiff-Appellant,*

    v.

SOUTH CAROLINA DEPARTMENT OF
TRANSPORTATION; NORMAN Y.
MINETA, SECRETARY, UNITED STATES
DEPARTMENT OF TRANSPORTATION,

    *Defendants-Appellees.*

No. 00-1808

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Dennis W. Shedd, District Judge.
(CA-97-1608-8-13BD)

Argued: March 1, 2001

Decided: May 9, 2001

Before NIEMEYER, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

### COUNSEL

**ARGUED:** Charles Russell Horner Shearer, CADWALADER,
WICKERSHAM & TAFT, Washington, D.C., for Appellant. John
Luther Smeltzer, UNITED STATES DEPARTMENT OF JUSTICE,

Washington, D.C., for Appellees. **ON BRIEF:** Geraldine E. Edens, CADWALADER, WICKERSHAM & TAFT, Washington, D.C., for Appellant. Lois J. Schiffer, Assistant Attorney General, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Kenneth W. Ebener, S. Jahue Moore, WILSON, MOORE, TAYLOR & THOMAS, P.A., West Columbia, South Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Nancy Wilds filed suit in the United States District Court for the District of South Carolina against United States Transportation Secretary Norman Mineta[1] and the South Carolina Department of Transportation (SCDOT) (collectively, the DOT) challenging two federal-aid highway projects in Aiken, South Carolina — the "Eastern Connector" and the "Pine Log" projects. On appeal from the district court's grant of summary judgment in favor of the DOT, Wilds argues that the DOT improperly segmented its environmental analysis into two projects; that the DOT improperly undertook the Pine Log project without issuing a final environmental assessment (EA); that the DOT failed properly to determine whether the Eastern Connector project would have significant induced growth and air quality impacts; that the DOT failed adequately to consider alternatives to the Eastern Connector project; and that the DOT improperly issued the EA and finding of no significant impact (FONSI) for the Eastern Connector project on the same day and without giving proper notice or considering relevant new information. Finding no reversible error, we affirm.

---

[1]The case was originally captioned against Rodney Slater, who is no longer the United States Secretary of Transportation.

## I.

The City of Aiken, South Carolina, is served by two major highways that intersect downtown — U.S. Route 78, which is an east-west route, and S.C. Route 19, which is a north-south route. These two intersecting highways connect to, inter alia, a series of roads that form an "Outer Loop" around Aiken. The roads in the Outer Loop include Rutland Drive, University Parkway, Richard M. Bell Parkway, Hitchcock Parkway, and Pine Log Road. Although termed the "Outer Loop," the series of roads does not form a continuous loop. Rather, the loop lacks a direct connection between the intersection of Route 78 and Pine Log Road, where the loop ends, and the Route 1 and Rutland Drive intersection, where the loop begins. Route 19 also connects to Interstate 20, a freeway that connects Atlanta, Georgia and Columbia, South Carolina.

In 1975, the SCDOT, in conjunction with the Federal Highway Administration (FHWA) and local government officials, prepared an "Aiken Area Transportation Study," which recommended improvements to the Outer Loop in order to divert traffic from downtown Aiken. In November 1989, the Aiken Comprehensive Plan incorporated these recommendations. The Plan recommended constructing the Eastern Connector and widening Pine Log Road.

### A.   *The Eastern Connector*

The Eastern Connector project is designed to improve SC Route 118 between SC Route 19 and US Route 78 by (1) widening Rutland Drive from a four-lane to a five-lane roadway and (2) building a new five-lane connecting roadway from the end of Rutland Drive to the intersection of Route 78 and Pine Log Road. The new roadway would remove another road, Beaufort Street, from the bypass system and make the Outer Loop more or less continuous. The purpose of the project is to address traffic and circulation difficulties in the project area, to handle projected traffic levels,[2] and to improve traffic flow

---

[2]The traffic volume as of July 7, 1995, the date of the final EA for the Eastern Connector, ranged from 10,100 vehicles per day to 16,400 vehicles per day. This exceeds the desired traffic volume of 7,800 vehicles per day. It is projected that the route will see 21,300 to 26,600 vehicles per day by the year 2015.

along the existing bypass system. The Eastern Connector would also provide a northeast bypass for drivers traveling between Route 78 and Interstate 20 interchanges.

In January 1994, the DOT issued its draft EA[3] for the Eastern Connector. On February 11, 1994, the FHWA approved the draft EA. The DOT sent notice to city, county, and state officials announcing the public availability of the EA and a public hearing on the Eastern Connector project, and on May 3, 1994, the DOT also published notice in the *Aiken Standard*, a local newspaper. On May 24, 1994, the DOT held a public hearing on the project. On January 10, 1995, the DOT forwarded its final EA to the FHWA. On July 7, 1995, the FHWA approved the location and preliminary design of the Eastern Connector project, approved the final EA, and issued a FONSI. On October 6, 1995, the DOT published notice in a local newspaper, the *Aiken Standard*, announcing public availability of the FONSI.

## B. *Pine Log Road*

The Pine Log Road project is designed to widen S.C. Route 302 from two lanes to four lanes and add a median strip and a fifth multi-purpose lane. There also would be a slight relocation of the end of the

---

[3]40 C.F.R. § 1508.9 (2000) provides that

Environmental Assessment:

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

roadway where it intersects with Route 78 to allow for a direct connection with the proposed Eastern Connector. The project is designed to relieve congestion and improve traffic flow between Route 19 and Route 78 and would also help complete the Outer Loop.

On March 19, 1996, the DOT issued a draft EA that evaluated potential impact of the project. On May 16, 1996, the FHWA sent a letter to the DOT recognizing that the DOT's draft EA had successfully addressed certain key concerns raised by the FHWA prior to submission of the draft EA. On the same day, the FHWA approved the draft EA. On July 18, 1996, after issuing a public notice, the DOT held a public hearing on the Pine Log project. On September 13, 1996, the DOT notified the FHWA that it had complied with the National Environmental Policy Act, 42 U.S.C.A. § 4332 (NEPA) and that NEPA review was complete. On September 19, 1996, the FHWA approved the location and preliminary design of the Pine Log project, and issued a FONSI for the project.

C.

In 1995, Wilds began lobbying to stop the highway projects because she believed that her property would be adversely impacted. On September 20, 1995, the South Carolina subcommittee of the Augusta Regional Transportation Study held a special meeting on the Eastern Connector project at Wilds's request. Approximately 80 other area residents attended the meeting and many of them objected to the project. Despite the objections, the subcommittee found no reason to alter the proposed project.

On June 2, 1997, Wilds filed suit against the Secretary of Transportation and the SCDOT.[4] She simultaneously filed a motion for preliminary injunction seeking to enjoin the Eastern Connector project pending further NEPA evaluations. The district court denied the motion for preliminary injunction. After the parties filed cross-motions for summary judgment, the magistrate judge issued a report recommending that summary judgment be granted in favor of the DOT. The district court accepted the magistrate judge's recommendation and granted the DOT's motion for summary judgment.

---

[4]Wilds filed suit pro se but later obtained counsel.

Wilds raises several issues on appeal. First, Wilds argues that the DOT improperly segmented its environmental analysis for the Eastern Connector and Pine Log projects from each other and from the Outer Loop. Second, Wilds argues that the DOT improperly undertook the Pine Log project without issuing a final EA. Third, Wilds argues that the DOT failed properly to determine whether the Eastern Connector project would have significant induced growth and air quality impacts. Fourth, Wilds argues that the DOT failed adequately to consider alternatives to the Eastern Connector project. Finally, Wilds argues that the DOT improperly issued the EA and the FONSI for the Eastern Connector project on the same day and that the DOT failed to give proper notice or to consider relevant new information.

## II.

We review the district court's grant of summary judgment de novo. We must determine whether the DOT's decision was "arbitrary, capricious, or otherwise not in accordance with law, or unsupported by substantial evidence." *Roanoke River Basin Ass'n. v. Hudson*, 940 F.2d 58, 61 (4th Cir. 1991) (internal quotation marks omitted). "To apply the standard, we must make a searching and careful inquiry into the facts and a review of whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment, although naturally we are not empowered to substitute [our] judgment for that of the agency." *City of Alexandria v. Fed. Highway Admin.*, 756 F.2d 1014, 1017 (4th Cir. 1985) (internal quotation marks omitted). Rather, our role is "to see that the official or agency take[s] a 'hard look' at all relevant factors." *Coalition For Responsible Reg'l Dev. v. Coleman*, 555 F.2d 398, 400 (4th Cir. 1977) (internal quotation marks omitted).

NEPA provides that "all agencies of the Federal Government shall"

> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> > (i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C.A. § 4332(2)(C)(i)-(v) (West 1994).

"NEPA declares a national policy of protecting and promoting environmental quality. To implement this policy, NEPA requires federal agencies to follow certain procedures before undertaking projects that will affect the environment." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996) (*Hughes River I*). "Thus, although NEPA establishes environmental quality as a substantive goal, it is well settled that NEPA does not mandate that agencies reach particular substantive results. Instead, it simply sets forth procedures that agencies must follow." *Id.* (internal citations omitted). "In other words, if the adverse environmental effects of . . . proposed actions are adequately identified and evaluated, agencies are not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* (internal quotation marks and alterations omitted). "Central to NEPA's procedural focus is the requirement that federal agencies prepare [environmental impact statements (EIS)] to be included in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment." *Id.* (internal quotation marks omitted). "Preparation of an EIS serves the national policy of protecting and promoting environmental quality in two ways." *Id.* "First, it ensures that an agency, when deciding whether to approve a project, will carefully consider, or take a 'hard look' at, the project's environmental effects." *Id.* "Second, it ensures that relevant information about a proposed project will be made available to members of the public so that they may play a

role in both the decisionmaking process and the implementation of the decision." *Id.* (internal citations omitted). In reviewing the agency's decision to issue a FONSI rather than perform an EIS, a court must determine whether the agency took a "hard look" at the project's effects and whether the decision was arbitrary or capricious. *See id.* (addressing "hard look" in context of whether agency should have issued a supplemental EIS). "[A]n agency takes a sufficient 'hard look' when it obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are raised." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999) (*Hughes River II*). "Although an agency should consider the comments of other agencies, it does not necessarily have to defer to them when it disagrees." *Id.* "Agencies are entitled to rely on the view of their own experts. As long as the adverse environmental effects of a proposed action are sufficiently identified and evaluated, an agency is vested with discretion to determine under NEPA that other values outweigh the environmental costs." *Id.* (internal quotation marks and citations omitted).

In determining whether a project has a significant environmental impact, an agency may not avoid significant environmental impact by improperly "segmenting" a project by dividing the NEPA analysis of a larger action with significant impacts into smaller actions with insignificant impacts. *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1140 (5th Cir. 1992). "Segmentation analysis functions to weed out projects which are pretextually segmented, and for which there is no independent reason to exist. When the segmentation project has no independent jurisdiction, no life of its own, or is simply illogical when viewed in isolation, the segmentation will be held invalid." *Id.* at 1139 (internal quotation marks and emphasis omitted); 23 C.F.R. § 771.111(f) (2000).[5] "Segmentation becomes

---

[5]23 C.F.R. § 771.111(f) provides:

(f) In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS or finding of no significant impact (FONSI) shall:

(1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

suspect, however, only after an evaluation of such factors as whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects." *Save Barton Creek Ass'n*, 950 F.2d at 1140. "In the context of a highway within a single metropolitan area, as the case at issue — as opposed to projects joining cities — courts have focused more on the factor of 'independent utility.'" *Id.*; *see also Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987) (noting that courts focus more heavily on the independent utility factor).

The magistrate judge, whose recommendation the district court adopted, recognized the impermissibility of segmenting a project into smaller parts in order to avoid preparing an EIS. He concluded, however, that the DOT did not improperly segment the projects because the Eastern Connector had independent utility and logical termini and, thus, was properly treated as a separate project from the Outer Loop and the Pine Log project.[6] The magistrate judge also concluded that the EA for the Eastern Connector project adequately addressed air quality and induced growth impacts for the project; that the EA for the Eastern Connector project adequately considered alternatives to the project; that the DOT gave proper notice of the public hearing; and that the DOT did not act improperly by issuing its final EA on

---

(2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

[6]It was likewise not improper for the DOT to segment the Pine Log project from the Eastern Connector project and the Outer Loop. It is clear that the widening of Pine Log Road will benefit traffic along Pine Log Road regardless of whether the other projects are completed. Because the Pine Log project merely widens a road that already exists, it is self-evident that the Pine Log project has independent utility beyond its connection to other projects.

the same day as the FONSI because, among other reasons, the DOT had issued its draft EA over a year before issuance of the FONSI.

We have reviewed the record, briefs, and pertinent case law on this matter, and we have had the benefit of oral argument. Our careful review persuades us that the rulings of the district court were correct. *See Wilds v. Slater*, No. 3:97-1608-19BD (D. S.C. April 19, 2000). Accordingly, we affirm the judgment of the district court.

*AFFIRMED*